[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 97-2664

_____

D. C. Docket Nos. 95-590-CIV-T-17E
95-623-CIV-T-25B

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
08/31/98
THOMAS K. KAHN
CLERK

ROBERTS & SCHAEFER CO.,

Plaintiff-Counter-Defendant-Appellee, Cross-Appellant,

versus

HARDAWAY CO., a Georgia corporation,

Defendant-Counter-Claimant, Appellant-Cross-Appellee.

_____

HARDAWAY CO., a foreign corporation,

Plaintiff-Appellant, Cross-Appellee,

versus

ROBERTS & SCHAEFER COMPANY,
a foreign corporation,

Defendant-Appellee, Cross-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(August 31, 1998)**

Before DUBINA and MARCUS, Circuit Judges, and CLARK, Senior Circuit Judge.

MARCUS, Circuit Judge:

This diversity case arises out of three contracts between Roberts & Schaefer Company ("R & S"), a general contractor, and The Hardaway Company ("Hardaway"), a subcontractor, concerning construction of a phosphate beneficiation plant for Mobil Mining & Minerals Co. ("Mobil"). Following a jury trial before the magistrate judge, the court entered judgment for Hardaway on two of the contracts, and judgment for R & S on the third. On appeal, Hardaway contends that the magistrate judge erred in permitting R & S to take advantage of the unilateral mistake doctrine with respect to one of the contracts and further asserts that the trial court incorrectly applied the doctrine in this case. R & S, meanwhile, cross-appeals and challenges the damages awarded to Hardaway on one of the other contracts. We find that the magistrate judge acted within his discretion when he applied the unilateral mistake doctrine in this case. We also conclude that the damages award to Hardaway is not in error. Accordingly, we affirm the judgment.

I.

A.

A detailed review of the facts is necessary to understand our holding. Mobil engaged R & S to design and build a phosphate beneficiation plant for an initial lump sum of approximately $44,300,000. In accordance with Mobil's arrangement with R & S, construction was to proceed on a "fast track." In the construction business, this means that construction commences under a schedule of simultaneous design, building, and

-2-

construction.   In other words, in this case, R & S was to begin construction before it completed the design and finalized a set of fully coordinated plans.

Consistent with fast-track construction, prior to finishing the design of the plant, R & S awarded three subcontracts to Hardaway.  Specifically, and in the order of award, R & S and Hardaway entered into subcontracts for (1) structural steel/mechanical erection ("703 Contract"), (2) underground piping ("707 Contract"), and (3) above-ground piping ("712 Contract").  Although only the 712 and 703 Contracts are at issue on appeal, we review formation of all three contracts to establish the parties' pattern of doing business.

Each of the three Contracts awarded contained engineering plans and specifications comprising hundreds of pages.   The substance of the agreement between the parties, however, was contained within the Construction Agreement, which was nearly identical in all three Contracts.  Among other relevant provisions, the Construction Agreements provided as follows:

ARTICLE II: PERFORMANCE OF THE WORK BY CONTRACTOR

\* \* \*

2.3     Contractor shall employ sufficient labor and supervision to work as many shifts per week as necessary to complete the various components of the work by the interim completion dates specified in the agreed upon Schedule. . . .

\* \* \*

ARTICLE V: WORK SCHEDULE

\* \* \*

5.1 Contractor shall submit to Company a proposed Work Schedule for the Work set out in a form in conformance with the Specifications.

5.2 After review and approval of the proposed Work Schedule by Company, the Schedule shall be binding on both parties, and shall be changed only in conformance with the provisions of this Agreement.

5.3 It is further agreed that time is of the essence of each and every portion of this Agreement and of the Specifications wherein a definite and certain length of time is fixed for the performance of any act whatsoever; and, where an additional time is allowed for the completion of any Work, the new time limit fixed by such extension shall be of the essence of this Agreement. If Contractor fails to meet any deadline set forth in the Contract Documents, Contractor shall be liable to Company for any excess costs incurred which are attributed to Contractor's failure.

\* \* \*

ARTICLE VII: CHANGES, DELETIONS AND EXTRA WORK

\* \* \*

7.1 Company may, at any time, make additions, deletions, or changes in the Work of either a major or a minor nature. All such modifications shall be authorized by written change orders.

\* \* \*

7.9 If any dispute shall arise under this Agreement, Contractor shall continue to execute the work pending determination thereof unless requested by the Construction Manager or Company to suspend or terminate the Work or any portion thereof.

\* \* \*

ARTICLE XII: TERMINATION ON CONTRACTOR'S DEFAULT

12.1 Company may, without limitation or exclusion of any other remedy, terminate Contractor's right to perform the Work, if:

(a) Contractor shall fail to:

a. Make such progress with the Work as reasonably to conform with the Approved Work Schedule, or

\* \* \*

(vii) Perform any other material obligation required by this Agreement,

\* \* \*

12.5 If the Company terminates Contractor's right to perform the Work asserting one of the grounds set out in Paragraph 12.1 and those grounds are subsequently determined to be inapplicable, Company's action shall then be deemed to be a termination pursuant to Article XIII.

ARTICLE XIII – TERMINATION FOR COMPANY'S CONVENIENCE

13.1 Company may terminate this Agreement for its convenience on giving written notice to Contractor. Contractor shall stop all Work on the date specified in the notice, and Company shall pay Contractor for:

(a) All Work satisfactorily performed to date of termination, and

(b) All actual and reasonable costs incurred by Contractor as a consequence of the termination.

Company shall [] not be liable to pay any bonus, damage or other claim asserted by Contractor for its expected profit on the uncompleted portion of the Work.

\* \* \*

1. The 703 Contract

When R & S invited Hardaway to bid on the 703 Contract, Hardaway responded with a written, signed bid and a form showing exceptions or clarifications to the bid drawings and specifications. A post-bid/pre-award meeting occurred between R & S and Hardaway. On March 9, 1994, R & S awarded the 703 Contract to Hardaway by signed letter accepting a bid of $2,497,000, and stating that a formal contract would be signed later. Hardaway began work on March 9. On April 6, 1994, it submitted a pay application seeking $152,550. The parties signed a formal contract the same day, with an "effective" date of March 8, 1994, corresponding to the date of oral notification of the award.

The 703 Contract was bid and accepted on a lump-sum basis. For a lump sum, Hardaway was to employ all sufficient labor and supervision to work as many shifts as necessary to complete the work by the interim completion dates. Hardaway agreed to submit a critical path method ("CPM") schedule. A CPM is a standard construction device used to plan the activities of a construction project in a logical, orderly sequencing manner citing durations for the different activities from the beginning of the job to the end. A CPM is created by dividing the entire project into discrete and quantifiable steps; in turn, each step is allotted an estimated time for completion. Ultimately, each step is arranged into a chronological sequence, thus revealing the anticipated length and structure of the entire construction schedule. In addition to serving as a road map for the contractors to determine when and where their work fits into the overall construction sequence, the CPM also assists contractors in assessing their hiring and material purchasing needs. All milestones and deadlines set for the 703 Contract were to have been set and maintained in Hardaway's CPM

schedule. If the work fell behind, R & S had the right to direct Hardaway to take all remedial action necessary, including increasing Hardaway's manpower and requiring extra shifts, to bring the work back on schedule at no additional cost to R & S.

Under the terms of the 703 Contract, R & S had the right to terminate Hardaway's performance on the project for cause or for convenience. If R & S elected to terminate Hardaway for cause and the grounds for termination were later determined to be inapplicable, the wrongful termination of Hardaway for cause automatically became one of convenience under Article XIII of the 703 Contract. Under such circumstances, Hardaway was entitled to receive compensation for all work satisfactorily completed, plus all actual and reasonable costs incurred as a consequence of the termination.

2.      The 707 Contract

For the 707 Contract, Hardaway submitted its written, signed bid for $922,000 on April 11, 1994. Within the bid, Hardaway set out its written exceptions to the bid drawings and specifications. R & S and Hardaway held a post-bid/pre-award meeting, and, by signed letter dated April 27, 1994, R & S awarded the 707 Contract to Hardaway. The letter indicated that a formal letter would follow. Hardaway commenced work before signing the formal construction agreement, filing a pay application for $200,000 for work through May 31. On June 6, 1994, Hardaway signed the formal 707 Contract. The effective date of the agreement was April 27, 1994, the same date of the 707 Contract award letter.

3.      The 712 Contract

The parties employed the same pattern for reaching agreement on the 712 contract for above-ground piping as they did on the 703 and 707 Contracts. On March 14, 1994, Roberts & Schaefer invited Hardaway to submit a proposal. Because of the fast-track status of the project, final plans for the above-ground pipes had not been developed, so the bid drawings did not identify all above-ground pipes to be provided. Note 15 on Drawing 605-P-001, however, stated that pipe supports ". . . shall be provided as stated in the pipe specifications." It further provided that any supports not shown on the drawings but necessary for complete installation to prevent vibration, sag, movement or stress shall be provided by Hardaway. Hardaway made no exception in its bid to any of these requirements. In addition, Hardaway received Addendum 01 and Clarification 09, which provided pipe support details and included some "engineered" supports.

As in the case of the 703 and 707 Contracts, R & S and Hardaway held a post-bid/pre-award meeting. Hardaway claims that from the outset of negotiations, it informed R & S that it did not wish to assume the duty to provide hangers and supports for above-ground pipes six inches in diameter or larger that were not shown in the original bid drawings because Hardaway did not have the engineering expertise necessary to design these hangers and supports and because it had not factored the engineering and installation of these hangers and supports into its bid for the above-ground piping work. R & S, however, asserts that Hardaway made no exception to the requirement in the bid and contract specifications that it supply and install all pipe hangers and supports, including "engineered" supports.

By letter dated June 21, 1994, R & S awarded the 712 Contract to Hardaway. As with the other Contracts, R & S indicated in this letter that a formal contract would follow. Soon thereafter, Hardaway commenced work on the 712 Contract, submitting pay applications for July, August, and September in the amounts of $151,923, $146,379, and $451,839, respectively. To determine the prices to place on its first three pay applications, Hardaway relied on the bid documents.

By letter dated September 21, 1994, Don Carlson of R & S sent three sets of the formal contract documents to Hardaway for signature. The effective date of the agreement was to be June 21, 1994, the same date as the award letter for the 712 Contract. Within the September 21, 1994 contract documents was a document entitled "Roberts & Schaefer Contract Clarifications," which was derived from notes taken by R & S's Frank Anderson at the post-bid/pre-award meeting between R & S and Hardaway. Point 14 provided, "The contractor shall furnish and install all supports shown on the drawings and as required for proper support of the pipe. The customer will provide assistance to the Contractor in the design of major pipe supports and supports not shown on the drawings. All supports are part of the Scope of the Work and are included in the Original Proposal." On behalf of Hardaway, Richard Dei, Vice President, signed three sets of the construction agreements sent by R & S and transmitted them back to Carlson by letter dated October 17, 1994. Dei placed an asterisk beside his signature, which read, "Contingent on acceptance of 'Agreement Clarification Attachment.'" The Attachment, in turn, revised point 14 of R & S's Contract Clarifications to read, "The contractor shall furnish and install only the supports shown on

-9-

drawings for large bore piping and <u>all</u> supports required for proper support of small bore piping. The customer will provide design and furnish large bore pipe supports not shown on the drawings."

R & S had a contract review process in place in which the project team was first supposed to review the contract, and, once the team leadership was satisfied, the team was to take the contract to an individual with signing authority to sign the contract. In this case a project team staff member, Elisabeth Johnson, brought the contracts to Bruce Hale, who had signature authority for R & S. Although neither Don Carlson nor Frank Anderson, the leaders of the project team, had agreed to the Attachment, and, indeed, both had qualms about the Attachment, Johnson, for reasons that are not explained in the record, provided Hale with both the original contract and the Attachment, which bore stickers indicating where Hale should sign. Believing that he was signing the original contract R & S had sent Hardaway and documents that had been approved by Anderson and/or Carlson, Hale signed the agreement and the Attachment. In fact, the project leadership had not approved the Attachment pursuant to its formal contract-reviewing and signing procedures. On November 2, 1994, R & S sent one signed contract back to Hardaway's office in Tampa by Federal Express. In a telephone conversation between Carlson and Hale the following day, Carlson advised Hale that he should not have signed the contract because the project team had not approved the Hardaway Attachment.

That same day, November 3, Hale called Dei, who was in Virginia, and advised him that the project people at R & S had not reviewed and approved the contract at the time of

Hale's signing, and he had signed the contract in error. Thus, Hale told Dei, his signature was void. Hale testified that during his telephone conversation with Dei, Dei responded that "we" do not want to move ahead with disagreement and "we" certainly want to agree with the bid documents and the meetings and telephone conversations that had been held. Also that same day, Hale wrote Dei a letter confirming the telephone conversation:

> This letter is written to confirm our telephone conversation of this date regarding the formal contract for the piping work at the South Fort Meade Project. I signed the contract with the understanding that our Mr. Don Carlson and Mr. Frank Anderson had reviewed the document prepared by Hardaway titled "Agreement Clarification Attachment." Subsequent to my signing the contract on October 28, 1994 it came to my attention that neither Mr. Carlson nor Mr. Anderson had reviewed the "Agreement Clarification Attachment." Therefore, as we discussed on this date my signature is void. I request that the original signed sheets be returned to me at your earliest opportunity to avoid any misunderstandings later on.
>
> * * *
>
> The essence of our conversation on this date was that we both agreed that the work is to be performed in accordance with the bid documents, clarifying telephone conversations and the discussions held in our office between Messrs. Bruce Hale, Don Carlson and Frank Anderson of Roberts & Schaefer Company and Messrs. Dick Dei[,] Dick Snyder and Tim Haverland of the Hardaway Company.
>
> Please acknowledge this letter at your earliest convenience.

The record is devoid of any evidence indicating any kind of response to Hale's letter from Dei or anyone else at Hardaway.

-11-

Meanwhile, before either party signed the 712 Contract, R & S became concerned about what it viewed as Hardaway's insufficient manpower, lack of scheduling, poor workmanship, and slow progress on the 703, 707 and 712 Contracts. Consequently, Hale negotiated an agreement in October 1994 with Hardaway in which Hardaway agreed that it would accelerate and complete its work on all three contracts by a late finish of March 1, 1995, in exchange for the sum of $425,000 ("October Acceleration Agreement"). Hardaway continued working on the 712 Contract and submitting monthly pay applications through March 31, 1995, under the terms of the 712 Contract, claiming payments due of 90% of the 712 Contract amount. Hardaway also initiated and negotiated a number of change orders to the 712 Contract for design changes totaling $459,928. R & S, however, was unsatisfied with Hardaway's work and contended that "Hardaway's safety problems and work ethic continued to plague the Project. . . . Hardaway's workers were not putting in full days. . . . Failure to provide a proper schedule, along with slow progress, and concerns about Hardaway billing Roberts & Schaefer for [w]ork not done, continued." R & S's Initial Br. at 15.

On March 13, R & S offered Hardaway $1,000,000 if Hardaway would work the hours necessary to guarantee a new completion date of April 21. Although Hardaway claimed 90% completion, it declined to accept the offer. To meet its contractual requirements with Mobil, R & S supplemented Hardaway forces by hiring The Industrial Company ("TIC") on March 15. On April 15, 1995, R & S terminated Hardaway. The letter of termination invoked Article XII of the Contract and stated that Hardaway was terminated

-12-

on all three Contracts because (1) Hardaway caused delays, (2) Hardaway hampered R & S's ability to complete the Plant to Mobil's satisfaction, (3) Hardaway failed to cooperate in its contractual duty to develop and follow a work schedule, (4) it was necessary to supplement Hardaway's work forces, (5) Hardaway failed to cooperate with R & S and TIC to do the work and develop a schedule that would ensure timely completion, (6) Hardaway did not provide necessary materials, (7) Hardaway placed an exaggerated lien on the project, (8) Hardaway refused to take direction, (9) Hardaway would not supply adequate manpower and supervision, and (10) Hardaway refused to complete the work.

B.

On April 18, 1995, R & S filed suit against Hardaway, alleging that Hardaway had

breached Contracts 703, 707, and 712, and seeking damages and an accounting. Hardaway

filed a separate lawsuit claiming that the termination was wrongful because Hardaway had

never agreed to engineer and install the hangers and supports on the 712 Contract. The

district court consolidated the two cases. After extensive discovery, a jury trial was

conducted by consent before the magistrate judge.

The jury trial began on January 21, 1997, and lasted fourteen days. With respect to

Contract 712, the magistrate judge instructed the jury as follows:

> As to Contract 712, the parties dispute what actually constitutes
> the agreement. This Court has determined that the parties'
> agreement encompassed – in regards [sic] to Contract 712, this
> Court has determined that the parties' agreement encompassed
> the bid documents as modified by other communications by and
> between the parties which were mutually agreed to by the
> parties, including clarifications mutually agreed to – or mutually
> agreed upon.
>
> In determining the scope of this contract, keep in mind that for
> a valid contract there must be an offer by one party to another
> and an acceptance of the offer by the party who received it.
> There must exist a meeting of the minds as to the terms of the
> agreement. If there is not such a meeting of the minds, there is
> no agreement or contract.

During the second full day of deliberations, on February 12, 1997, the jury submitted

questions to the magistrate judge, which the magistrate judge characterized as follows:

> THE COURT: It says: The Contract 712, Judge's instruction to
> jury . . . starts out by quoting the instructions . . . : As you know
> . . . this Court has determined that the parties' agreement

-14-

encompassed the bid doc as modified by other communication, and that was underlined . . . ."

And then there are these questions. The first question says: Does . . . "communication" . . . mean bid and bid clarifications?

Two, question two: Does it include bid, . . bid clarification, signed contract, and the contract clarifications?

Three: Is Mr. Hale's request for voiding of his signature on Contract 712 considered legally voided . . .?

In considering his response to the jury's questions, the magistrate judge stated:

The import on [sic] my ruling on the matter of unilateral mistake was that the written contract and contract clarifications for 712 was not the operative contract. What was the operative contract were those bid documents and other communications, including clarifications agreed upon. Those were the controlling documents. And as I say, this question from the jury doesn't allow me to revisit that issue.

The magistrate judge then revealed to the parties his response to the jury's question:

Okay. What I've written on this jury note says: Please carefully consider all of the Court's instructions on these contracts . . . . As stated at page 10, Contract 712 is composed of the bid documents, . . . as modified by subsequent communications by and between the parties , . . . which you find , . . . by a preponderance of the evidence, . . . were mutually agreed upon by the parties. . . .

The jury returned a verdict for Hardaway on Contracts 703 and 707, awarding Hardaway $1,512,064 and $160,493, respectively. With regard to Contract 712, the jury returned a verdict for R & S, awarding $3,243,268. Hardaway timely filed a motion for judgment as a matter of law and, alternatively, for a new trial and to reduce the verdict. R & S also filed a timely motion for a new trial, or alternatively, for remittitur, challenging the

amounts awarded to Hardaway under the 703 and 707 Contracts. The magistrate judge denied both motions. This appeal followed. On appeal, Hardaway contests the judgment for R & S on the 712 Contract, while R & S challenges the damages awarded to Hardaway under the 703 Contract.

## II.

### A. The 712 Contract

Hardaway contests the magistrate judge's jury instructions regarding the composition of the 712 Contract. Specifically, Hardaway contends that the magistrate judge erred in excusing Hale's signature to the Agreement Clarification Attachment under the unilateral mistake doctrine and removing the document from the jury's consideration. Under Florida law, which we are bound to apply by Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), application of the unilateral mistake doctrine is a matter of equity subject to review for abuse of discretion and sufficiency of the evidence. See Maryland Cas. Co. v. Krasnek, 174 So.2d 541, 542-43 (Fla. 1965) (describing unilateral mistake doctrine as equitable and holding that where there is "substantial evidence to support [a finding of unilateral mistake]," the trial court's conclusion should not be disturbed on appeal.); Florida Cranes, Inc. v. Florida East Coast Properties, Inc., 324 So.2d 721, 722 (Fla. Dist. Ct. App. 1976) ("[E]quity can correct a unilateral mistake . . . ."); Alberts v. Federal Home Loan Mortg. Corp., 673 So.2d 158, 159 (Fla. Dist. Ct. App. 1996) (in judicial sale cases involving the same facts regarding unilateral mistake, courts may permissibly reach different results because standard of review is abuse of discretion).

Florida case law allows for application of the unilateral mistake doctrine where all of the following conditions are met: (1) the mistake "goes to the substance of the agreement," (2) the error does not result from an inexcusable lack of due care, and (3) the other party has not relied upon the mistake to his detriment. Langbein v. Comerford, 215 So.2d 630, 631 (Fla. Dist. Ct. App. 1968) (citing Maryland Cas. Co. v. Krasnek, 174 So.2d 541 (Fla. 1965)); see also Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Anderson, 445 So.2d 612, 613 (Fla. Dist. Ct. App. 1984). Based on Florida case law, we cannot say that the magistrate judge abused his discretion in concluding that all of the factors were satisfied in this case.

The first requirement -- that a mistake "go[] to the substance of the agreement" -- is compelled by the rule that a meeting of the minds must occur in order to create a contract. Where one party misunderstands, or otherwise makes a mistake that goes to the substance of the agreement into which it enters, no meeting of the minds occurs, and thus, no contract exists. See Langley v. Ironsland & Dev. Co., 114 So. 769, 771 (Fla. 1927). Thus, as Florida courts have interpreted the standard, a mistake may be found to "go[] to the substance of the agreement" where, among other circumstances, an employee of a party enters into a contract or releases another party from a contract under the mistaken belief that he is authorized to do so or that the contract pertains to something other than it does.

In Bethlehem Steel Corp. v. Centex Homes Corp., 327 So.2d 837 (Fla. Dist. Ct. App. 1976), for example, Bethlehem Steel Corporation ("Bethlehem") transmitted a proposal to Centex Homes Corporation ("Centex") whereby Bethlehem would furnish, fabricate, and deliver steel to Centex at its job site on Miami Beach for a specified price. Although Centex

failed to accept the offer within the specified time, it authorized Bethlehem by letter "to proceed with shop drawings" on the project, with the actual supplying of the steel to be "subject to our receipt of a building permit." Centex later submitted a purchase order to Bethlehem for approval. Michael J. McCooey, Assistant Manager of Sales for Bethlehem, found the terms of Centex's purchase order unacceptable and did not intend to accept it because the price was unsatisfactory. McCooey, however, mistakenly initialed the purchase order, and Bethlehem processed, approved, and returned the order to Centex. Immediately upon discovery that the offer was accepted by mistake, Bethlehem so advised Centex. After alleged negotiations between Bethlehem and Centex, Centex sued for breach of contract because Bethlehem failed to honor the terms of the purchase order it had signed. The trial court granted summary judgment on the issue. The appellate court reversed, finding that genuine issues of material fact existed, including whether Bethlehem had committed a remediable unilateral mistake. In remanding the case to the trial court for further proceedings, the appellate court instructed the trial court to determine whether the mistake went to the substance of the contract or whether there was excusable neglect by Bethlehem. Plainly, the appellate court remanded the case to the trial court for factual findings regarding whether the reason Bethlehem found the proposed purchase order unacceptable (the price was not satisfactory) went to the substance of the agreement, thereby preventing a meeting of the minds from occurring and a contract from being formed; the appellate court did not remand for further factual findings concerning whether the reason Bethlehem accidentally

-18-

signed the purchase order went to the substance of the agreement.[1]  Indeed, the appellate

court was well aware of the all of the facts concerning the manner in which the mistake

occurred and no doubt would have affirmed the trial court's entry of summary judgment and

preserved valuable judicial resources had it agreed that the fact that the error had occurred

as a result of McCooey's accidental signature to the purchase order precluded a finding that

the mistake went to the substance of the agreement.

The instant case is very similar to Bethlehem Steel.  Just as McCooey mistakenly

signed the agreement, Hale likewise signed the Attachment in error.  The manner in which

the mistake occurred is not important when we are determining whether the error goes to the

substance of the agreement.  Rather, the inquiry focuses on whether the mistake prevented

a meeting of the minds from occurring, and thus, a contract from forming.  In this case, the

magistrate judge acted within his discretion in determining that it did.  Frank Anderson, a

project team leader for R & S, testified that R & S had not authorized Hale to enter into the

Attachment because the Attachment stated, among other things, that Hardaway would be

responsible for providing "only the supports shown on drawings for large bore piping and

all supports required for proper support of small bore piping. [R & S] will provide design and

---

[1]Even if the appellate court had remanded the matter to the trial court for factual findings on the question of whether the reason Bethlehem accidentally signed the document went to the substance of the agreement, the result is the same.  The fact that the appellate court was not able to determine based on the record before it that such a finding was precluded demonstrates that under Florida law, the reason for McCooey's accidental signature could have constituted a mistake going to the substance of the contract.  Under the abuse-of-discretion standard we must apply, "When there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  Anderson v. City of Bessemer, 470 U.S. 564, 574 (1985).

furnish large bore pipe supports not shown on the drawings." R & S, however, wanted

Hardaway to provide all supports for all pipes. Thus, the evidence is sufficient to show that

Hale's signature on the Clarification consequently could not be considered evidence of a

meeting of the minds between Hardaway and R & S, and we cannot say that the magistrate

judge abused his discretion in determining that no meeting of the minds had occurred, and

therefore, Hale's error in signing the Attachment went to the substance of the agreement.[2]

    The second factor that must be satisfied in order to receive relief under the unilateral

mistake doctrine requires the party that made the mistake to demonstrate that the error did

---

[2]Nor, as Hardaway suggests, does Williams, Salomon, et al. v. Harbour Club Villas Condominium Ass'n, Inc., 436 So.2d 233 (Fla. Dist. Ct. App. 1983), prohibit such a finding. In Williams, a law firm agreed for a flat fee of $3,500 to represent Harbour Club Villas Condominium Association, Inc. ("Harbour Club") in court in a zoning dispute with the developer of Quayside Associates, Ltd. ("Quayside"), a neighboring condominium. Harbour Club wound up settling with Quayside for the sum of $3,000,000. The law firm did not participate in the settlement negotiations. Nevertheless, it then sued Harbour Club for rescission of the representation agreement. In support of its action, the law firm argued, among other contentions, that the $3,500 fee arrangement should be rescinded because either a unilateral or a mutual mistake occurred since the parties did not envision a monetary settlement when they entered into the agreement. The appellate court noted that the parties had agreed that the law firm would represent the Harbour Club for a fixed fee in court proceedings relating to the zoning dispute and that the Harbour Club had in fact paid the $3,500 fee and the law firm had represented the Harbour Club in court. Further noting that nothing in the contract discussed settlement and that the law firm had not participated in settlement, the appellate court concluded that the "mistake" -- that the law firm did not anticipate that the Harbour Club might settle -- had nothing to do with, or, at best, was "incident to [the] contract" binding the law firm to represent the Harbour Club in court for a fixed fee. Id. at 235. In other words, whether the Harbour Club settled did nothing to change the fact that a meeting of the minds had occurred when the Harbour Club and the law firm entered into the agreement that the law firm would represent the Harbour Club in court, and thus, the "mistake" did not go to the substance of the agreement between the parties. In this case, however, unlike in Williams, no meeting of the minds occurred; the parties never agreed on the Attachment -- even at the time that Hale signed it. Consequently, Williams is instructive only to the extent that it demonstrates that the error at issue in this case was not one that was "incident to [the] contract" under Florida law. Id.

not result from an inexcusable lack of due care. Florida courts have interpreted this standard generously to the benefit of the erring party. In <u>Maryland Cas. Co. v. Krasnek</u>, 174 So.2d 541, 543 (Fla. 1965), for example, the Supreme Court of Florida considered a case where an insured submitted a claim to his carrier and the insurance company issued a check to the insured. As it turned out, however, the insured had allowed his policy to lapse. When the insurance agency discovered its error, it stopped payment on the check. The formerly insured individual instituted suit. The Supreme Court of Florida held that it was appropriate to apply the unilateral mistake doctrine under the circumstances. Noting that "mistakes do not ordinarily result from the exercise of due care," the court concluded that "this kind of mistake, whether by clerical error, bad communications, or otherwise," did not amount to inexcusable lack of care sufficient to prohibit application of the unilateral mistake doctrine. <u>Id.</u>

Likewise, returning to <u>Bethlehem Steel</u>, the appellate court determined that a question of fact existed as to whether McCooey had engaged in excusable neglect when he accidentally signed the purchase order, and the court remanded the matter to the trial court to make factual findings on the issue. Put another way, McCooey's accidental signature did not so plainly demonstrate a lack of due care by Bethlehem under Florida law that the appellate court could affirm the entry of summary judgment without factual inquiry by the trial court.

Indeed, this interpretation is consistent with the pronouncements of Florida courts that the equitable doctrine of unilateral mistake is appropriate for correcting a "mistake . . .

committed by an employee of the [party], [which] constitutes a simple but honest mistake which could lead to an unconscionable result." Florida Cranes, Inc. v. Florida East Coast Properties, Inc., 324 So.2d 721, 722 (Fla. Dist. Ct. App. 1976). In Florida Cranes, Florida Cranes made improvements to property owned by Florida East Coast Properties, Inc. ("Florida East Coast"). When Florida Cranes completed the work, however, Florida East Coast did not pay. Consequently, Florida Cranes filed a claim of lien against Florida East Coast's property. Florida Crane's counsel, who also represented an entity called Poston Bridge and Iron, Inc. ("Poston"), accidentally released Florida Crane's lien against Florida East Coast when he was attempting to release Poston's lien. Florida Crane then brought suit to cancel the release. In applying the unilateral mistake doctrine to relieve Florida Crane of the consequences of its attorney's error, the appellate court implicitly concluded that the attorney's mistake did not constitute a lack of due care by Florida Cranes.

Similarly, in State Bd. of Control v. Clutter Constr. Corp., 139 So.2d 153 (Fla. Dist. Ct. App.), cert. denied, 146 So.2d 374 (Fla. 1962), the State Board of Control ("Board") solicited bids to build a classroom building at the University of South Florida. To submit a bid, each bidder had to file with his bid a good-faith check in the sum of $80,000. Clutter Construction Corporation ("Clutter") determined it would submit a bid. To calculate the amount of the bid, Clutter sent two employees to Tampa, the location of the construction site, to receive bids from local sub-contractors to incorporate in its bid. In adding up the sub-contractors' bids on a computing machine, due to an error, the employees arrived at a bid that was $100,000 less than Clutter intended. Soon after Clutter submitted its bid, it learned that

-22-

its bid was $182,000 less than the next closest bid. Suspecting that it had made a mistake in determining the bid, Clutter immediately requested time to check the computations in its bid for possible error. After discovering the error, Clutter notified the Board and requested permission to withdraw its bid and have its $80,000 check returned. The Board refused, and Clutter instituted suit. The fact-finder concluded that although the mistake resulted from "a negligent act, such act did not amount to gross negligence" and applied the unilateral mistake doctrine to permit Clutter to withdraw its bid and receive its $80,000 check back. Id. at 155. The appellate court affirmed. In so doing, it specifically found that "clerical or inadvertent error in handling items of a bid, either through setting them down or in transcription" does not establish a lack of due care under the unilateral mistake doctrine. Id. at 156. The appellate court further distinguished the case from Graham v. Clyde, 61 So.2d 656 (Fla. 1952), a case in which a bidder accidentally submitted a bid that was $5,000 lower than intended, and the court refused to apply the unilateral mistake doctrine to relieve him of his bid. The court in Clutter found Graham distinguishable in part because in Clutter, "the mistake against which relief [was] sought was occasioned either by the malfunctioning of a computing machine, or by an error in manipulation committed by an employee of Clutter," whereas in Graham, the bidder sought relief from an error that "'he alone was responsible for.'" Clutter, 61 So.2d at 157 (quoting Graham).

As in Maryland Casualty, Bethlehem, Florida Cranes, and Clutter, in the instant case, an employee of R & S committed the mistake. Moreover, although the system did not work in this case, the fact that R & S created and used a system designed to prevent unauthorized

-23-

entry into contracts demonstrates that R & S had attempted to exercise due care in signing contracts. While we do not wish to encourage the type of error committed in this case by R & S, under the relevant Florida case law, we cannot say that the magistrate judge abused his discretion in concluding that R & S did not exhibit an inexcusable lack of due care when Hale made the mistake in question.

Finally, we consider whether Hardaway relied to its detriment on Hale's error. In so doing, we note that in order for the unilateral mistake doctrine to be barred on this ground, Hardaway must have "so changed [its] position in reliance upon [R & S's] undertaking that it would be unconscionable to rescind the contract or that it would be impossible to restore him to the <u>status quo</u>." <u>Maryland Cas. Co.</u>, 174 So.2d at 543. Based on the record, again we find that sufficient evidence exists to support the magistrate judge's conclusion that Hardaway did not detrimentally rely on Hale's mistake. First, we note that Hardaway conducted work on the 712 Contract for four months, from the end of June through October, in the absence of the Attachment. Second, on the very day that Hardaway should have received the Attachment with Hale's signature, Hale called Dei and told him that he was not authorized to sign the Attachment. Consequently, there was virtually no opportunity for Hardaway to rely on Hale's signature to the Attachment before it knew that R & S had not authorized entry into the Attachment. Third, Hale immediately followed up his telephone conversation with a letter in which he confirmed the telephone conversation. Fourth, Dei engaged in meetings with Carlson beginning on November 8, less than a week after Hale's telephone conversation with Dei, in which the two discussed and attempted to negotiate the

items in the Attachment. Indeed, on November 14, 1994, Dei and Carlson agreed to some items originally included in the Attachment, as evidenced by their initials on the R & S Contract Clarifications. Had Hardaway viewed the parties as already bound by the Attachment, there would have been no need for Hardaway to enter into yet another contract with R & S regarding some of the very same matters. In short, our review of the record indicates that the magistrate judge did not abuse his discretion when he concluded that Hardaway had not relied to its detriment on Hale's signature to the Attachment.

Hardaway next argues that even if the unilateral mistake doctrine applies, the result of this conclusion is that the Attachment is rescinded, and the magistrate judge should have instructed the jury that the parties never entered into a contract for the installation of above-ground piping. We apply a deferential standard of review to a trial court's jury instructions. Eskra v. Provident Life & Accident Ins. Co., 125 F.3d 1406, 1415 (11th Cir. 1997) (citations omitted). If the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instruction. Id. Under this standard, we examine "whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." Carter v. DecisionOne Corp., 122 F.3d 997, 1005 (11th Cir. 1997) (citation omitted). We will reverse the trial court because of an erroneous instruction only if we are "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." Id. (citation omitted). And we will find reversible error in the refusal to give a requested instruction only if (1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the

-25-

jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party. Goulah v. Ford Motor Co., 118 F.3d 1478, 1485 (11th Cir. 1997) (citation omitted).

Hardaway is correct in its assertion that a unilateral mistake rescinds the contract and returns the parties to the status quo. Langley v. Irons Land & Dev. Co., 114 So. 769, 771 (Fla. 1927). "Upon a rescission, the contract is annihilated so effectively that in contemplation of law it has never had any existence, even for the purpose of being broken." Hyman v. Cohen, 73 So.2d 393, 397 (Fla. 1954). Rescinding the Attachment, however, does not mean that no contract existed for the above-ground piping. Rather, under Florida law, a contract exists upon the award of a bid, even though no formal writing exists. See Schloesser v. Dill, 383 So.2d 1129, 1131 (Fla. Dist. Ct. App. 1980); American Recycling Co. v. County of Manatee, 963 F. Supp. 1572, 1582 (M.D. Fla. 1997). Consequently, when R & S accepted Hardaway's bid, a contract was formed under Florida law. Moreover, we note that where parties act as though a contract exists, there is a contract, even though no formal writing exists. See Block v. Drucker, 212 So.2d 890, 891 (Fla. Dist. Ct. App. 1968). In this case, following R & S's acceptance of Hardaway's bid and several negotiation meetings and discussions, Hardaway submitted pay applications and received payment for several months of above-ground pipe work on the 712 Contract before it sent R & S the Attachment. By this standard, too, then, a contract existed under Florida law prior to the creation of the Attachment. Because a contract existed even after the rescission of the Attachment, Hardaway's suggested instruction that no contract existed did not constitute an accurate statement of the law, and the magistrate judge did not err in rejecting it.

-26-

We further note that far from prejudicing Hardaway, the magistrate judge's instructions, which permitted the jury to consider not only the bid documents that comprised the contract under Florida law, but also the settlement discussions and negotiations, actually inured to Hardaway's benefit. Whereas the bid documents plainly required Hardaway to provide <u>all</u> pipe supports, the magistrate judge allowed the jury to consider the potentially mitigating evidence of the discussions between the parties to determine whether Hardaway was at some point relieved of its obligation under the bid documents to provide <u>all</u> supports. Consequently, we find no reversible error in the magistrate judge's instructions to the jury.

B. <u>703 Contract</u>

In R & S's cross-appeal, R & S makes several challenges to the damages award to Hardaway on the 703 Contract.[3] First, R & S argues that Article XIII of the Contract precludes the award of any damages other than those caused by the April 17 lockout and those due Hardaway for its substantial performance. In this regard, R & S first notes that the parties agreed in Article XII, section 12.5, that if R & S terminated Hardaway for cause that was later determined to be wrongful, the termination would automatically become one for convenience under Article XIII. Article XIII provides, in relevant part:

> 13.1 Company may terminate this Agreement for its convenience on giving written notice to Contractor. Contractor shall stop all Work on the date specified in the notice, and Company shall pay Contractor for:

---

[3]R & S concedes that Hardaway was entitled to $412,342.15 in damages under the 703 Contract ($11,514.08 for a lockout that occurred on April 17, and $400,828.07 for retention). Thus, when we discuss damages to which R & S objects, we do not refer to these damages.

1.      All Work satisfactorily performed to date of termination, and

2.      All actual and reasonable costs incurred by Contractor as a consequence of the termination.

Company shall not be liable to pay any bonus, damage or other claim asserted by Contractor for its expected profit on the uncompleted portion of the Work.

Claiming that all but the award for retention and the April 17 lockout are prohibited by this provision, R & S argues that the damages award is in error.

Two significant problems with this contention exist.  First, although Article XIII precludes the recovery of "expected profit," as R & S concedes, Hardaway did not seek anticipated profit; rather, it sought payment as permitted by paragraphs (a) and (b) of section 13.1 of Article XIII.  In addition, as discussed in more detail below, see infra, Hardaway sought damages for R & S's independent breaches of the 703 Contract beyond its wrongful termination of Hardaway.  Article XIII does not bar recovery of such damages.

Next, R & S argues that because the 703 Contract was awarded on a lump-sum basis, it included payment for all overtime and extra costs associated with overtime, such as premium time and overtime inefficiencies, and consequently, Hardaway should not be able to recover damages for such items.  In support of this argument, R & S cites to Marriott Corp. v. Dasta Constr. Co., 26 F.3d 1057 (11th Cir. 1994).  In Marriott Dasta subcontracted with Marriott to perform the exterior skin and drywall work on a fast-track project on which Marriott was serving as general contractor.  Among other provisions, the contract advised Dasta that its price should include "all increases in costs, foreseen or unforeseen, including

-28-

. . . labor and materials" and that "[a]ll loss or damage arising from any of the work through unforeseen or unusual obstructions, difficulties or delays which may be encountered in prosecution of the work, or through the action of the elements shall be borne by [Dasta]." Additionally, the contract contained a "no damage for delay" clause, which, among other functions, relieved Marriott of responsibility for "any loss or damage sustained by [Dasta], through delay caused by . . . Marriott . . . ." After the project was built, Marriott brought suit to recover payments it had made on Dasta's behalf to Dasta subcontractors and suppliers. Dasta counterclaimed, contending that Marriott had failed to carry out its contractual obligations and had interfered with and delayed Dasta's performance, causing Dasta to incur, among other costs, overtime and associated costs. On appeal we held that Dasta was not entitled to damages arising from delays allegedly attributable to Marriott. Pointing to the fact that the case under review, like Marriott, involves a contract on a fast-track project, R & S contends that Marriott precludes Hardaway's recovery of damages resulting from delays attributable to R & S.

Contract cases, however, are very contract-specific, and each case turns on the language of the contract and the facts before the court. Unlike the contract in Marriott, the 703 Contract did not place the risk of "[a]ll loss or damage arising from any of the work through unforeseen or unusual obstructions, difficulties or delays which may be encountered in prosecution of the work"on the subcontractor here. Nor did the 703 Contract relieve R & S of responsibility for "any loss or damage sustained . . . through delay caused by . . .[the general contractor]." Because of the substantial differences between the facts in Marriott and

-29-

the facts in this case, we do not find <u>Marriott</u> instructive here. Additionally, the record reflects that several witnesses, including Dei, Bob Lasater (Hardaway's ironworker superintendent), and Van Gross (Hardaway's ironworker foreman), testified that R & S caused significant delays in providing Hardaway with the necessary materials. If the jury found their testimony credible, as it presumably did, it could have properly found that Hardaway was entitled to damages incurred as a result of R & S's substantial delays. A thorough review of the 703 Contract reveals that Hardaway did not bargain to accept the risk that R & S's substantial delays might require Hardaway to incur overtime costs beyond such costs anticipated by the Contract. Indeed, R & S's agreement in the October Acceleration Agreement to compensate Hardaway for certain overtime costs demonstrates that the Hardaway did not bear the risk for incurring overtime and other costs resulting from R & S's significant delays. In view of these facts, we reject R & S's argument that the fact that the parties entered into a lump-sum contract precludes Hardaway from recovering damages for overtime and related costs.

Third, R & S asserts that the 703 Contract precludes Hardaway's entitlement to damages caused by the muddy lay-down site, misalignments of the bolt holes, and bad foundations and incomplete designs. With regard to the muddy site, R & S points to specification 01560 §1.01A, which provides, "[Hardaway] will be responsible for dust control, site dewatering, surface water control, and erosion and sedimentation control within its work area until work is completed." R & S contends that this provision placed the risk for muddy site conditions on Hardaway, and thus, R & S is not responsible for damages

-30-

arising from muddy conditions. The paragraph, however, may be interpreted in at least two ways, and the contract does not provide any enlightenment as to the proper construction. First, the provision may be read, as R & S urges, to place the risk of pre-existing as well as subsequently-existing poor water conditions at the site, including significant mud, on Hardaway. Alternatively, the section, when read in the context of the entire specification, which is entitled "Environmental Control," may be read to require Hardaway to maintain responsibility for any and all site conditions it plays a part in creating only. Indeed, with the exception of the provision devoted to "Rodent Control," the rest of the specification requires Hardaway to bear responsibility for circumstances it participates in creating, such as noise levels, dust levels, debris, pollution, and hazardous materials used or developed in association with the construction. This construction is particularly plausible in light of specification 01020 §1.01B's requirement that R & S provide Hardaway with an adequate lay-down site. Florida law "entrusts the resolution of factual conflicts of this kind, including those involving the terms and operation of written contracts, to the jury." Land O'Sun Realty Ltd. v. REWJB Gas Investments, 685 So.2d 870, 872 (Fla. Dist. Ct. App. 1996), review dismissed, 710 So.2d 978 (Fla. 1998) (citations omitted); see also Dickinson v. Auto Mfg. Co., 594 F.2d 523, 528 (5th Cir. 1979) ("Resolving conflicts in the evidence to determine the exact terms of the contract [is] properly the jury's responsibility."). Lasater testified that the site was like a "swamp," that after it rained, the men sometimes had to work in six inches of water, and that the ground was so muddy and soft that some of the trailers that came in to be unloaded would turn over from the ditches of water. This evidence is sufficient to

-31-

demonstrate that the swampy conditions at the site pre-existed Hardaway's construction efforts. Accordingly, because the jury plainly chose to construe the contractual provision at issue to limit Hardaway's responsibility for on-site water to water conditions Hardaway created, the evidence suffices to sustain the jury's verdict with respect to the muddy conditions.

As for the damages occasioned by the misalignments of bolt holes, R & S relies on specification 01020 §§1.04C.1.c & e, which provide:

> 3. For equipment supported on structures which are not being erected by the Contractor (equipment supported on tanks, etc.), the Contractor shall verify fit-up of all connections in advance. Misalignment problems which require changes to structural members shall be brought to the attention of the Construction Manager as soon as possible so corrective measures may be initiated. No delays in schedule will be granted for changes required due to not checking equipment and materials in advance.

* * *

> e. Contractor shall straighten and align anchor bolts as required for equipment installation.

R & S argues that these sections placed the burden on Hardaway to correct misalignments of bolt holes, and thus, R & S cannot be held responsible for damages resulting from the misalignment of bolt holes. There are two problems with this argument. First, the 703 Contract addresses both equipment installation and structural construction. The sections identified by R & S deal only with equipment installation, not structural construction. Second, with respect to equipment installation, neither subsection c nor e burdens Hardaway with bearing the responsibility for bringing faultily-holed materials into alignment. Rather,

subsection c requires only that Hardaway check for "[m]isalignment problems" and bring them to R & S's attention "as soon as possible so corrective measures may be initiated." Lasater testified that Hardaway did this. Nor does subsection e place the financial risk on Hardaway for bringing faultily-holed materials into alignment. Subsection e addresses the straightening and alignment of "anchor bolts," not bolt holes. Moreover, subsection c already places the financial responsibility for addressing "[m]isalignment problems" on R & S. To read subsection e as placing that responsibility on Hardaway does not comport with the language of subsection e and is directly contrary to the language of subsection c. We therefore decline to conclude that the 703 Contract precludes Hardaway's recovery of damages stemming from delays caused by the misalignment of bolt holes.

With respect to the damages caused by the poor foundation and design errors, R & S contends that Hardaway should have included anticipated costs for these factors in its bid, as Hardaway knew the project was being built on a fast-track schedule. Our review of the 703 Contract, however, simply has not revealed any provision that indicates that Hardaway bargained to take the risk that R & S would provide a poor foundation or improper designs. Nor has R & S pointed us to such a provision. Consequently, we cannot conclude that Hardaway bargained in entering into the 703 Contract to accept the risk that R & S would supply bad foundations and designs replete with mistakes.

Finally, R & S makes a number of arguments that can best be described as contentions that the evidence was not sufficient to sustain the damages awarded. Of these assertions, R & S first argues that Hardaway did not use a CPM, so "it is impossible to ascertain the

-33-

critical path for the construction work required by the 703 Contract," and thus, "it is impossible to determine the impact or proportion the cause of any particular delay." R & S's Initial Br. at 47. Similarly, R & S contends that Hardaway's alleged damages are speculative and that Hardaway failed to demonstrate that R & S's breaches were the proximate causes of Hardaway's damages. Along the same lines, R & S argues that without demonstrating the predicate foundation, Hardaway improperly employed the total-cost method in calculating damages.[4] Upon a thorough review of the record, we conclude that each of these arguments lacks merit.

Hardaway presented ample evidence which, if believed by the jury (as it obviously was), was sufficient to prove that R & S's actions and inactions were the proximate causes of determinable damages to Hardaway. First, Lasater testified that R & S repeatedly made late steel deliveries that were often out of sequence. R & S's failure to deliver the steel in the proper sequence led to a two-to-three week delay in the structural steel work in the raw feed area and inefficiencies in the installation work in the washer area. Moreover, in order to overcome the delays caused by R & S, Hardaway had to use three "raising gang" crews to complete the 703 Contract instead of the one crew Hardaway had planned to use. Lasater further testified that in the flotation area, Hardaway was forced to stop work because R & S had not delivered crucial steel columns. As a result, structural steel erection that should have

_____

[4]The total-cost method provides compensation for the total amount the sub-contractor expended above the sum of its estimate and the amounts paid the sub-contractor in change orders. <u>McDevitt & Street Co. v. Department of Gen. Servs.</u>, 377 So.2d 191, 192 (Fla. Dist. Ct. App. 1979).

-34-

taken ten weeks took more than twenty weeks. Furthermore, even when steel was delivered, Lasater testified, it was often cracked and warped, requiring that it be returned to the fabricator for correction. Lasater also complained that R & S failed to provide bolts of the proper size. Additionally, R & S's design of the structure yielded walkways that were too narrow to allow Hardaway to bring in the machinery it was to install within the building. Consequently, Lasater explained, Hardaway had to remove the walkways that had already been installed in order to make the machinery fit. Lasater also noted that design errors resulted in "center line" variances of up to six inches, which caused pieces not to align when Hardaway attempted to install them. This created additional sizing work, and Hardaway had to cut previously installed columns away from the base plate, move the columns to align with the anchor bolts, and then re-weld the columns into place. Furthermore, according to Lasater's testimony, seventy-five percent of the handrail R & S designed and provided to Hardaway did not fit when Hardaway attempted to install it because of elevation differences or length problems. Lasater testified that Hardaway had to use up to fifty percent of its manpower and equipment to address extra work caused by R & S's breaches, which diverted Hardaway from its contractual work. Indeed, as Lasater described the situation, there were so many problems for which R & S bore responsibility, that when Hardaway marked all the problems at the job site with red flags so R & S could locate them, the site "looked like a Christmas tree." Although Gross was not present at the job site during the entire period, he also confirmed that while he was there, he experienced delays in obtaining materials from R & S similar to the delays to which Lasater testified.

In addition, Dei testified about the costs incurred by Hardaway as a result of the delays, inefficiencies and extra work caused by R & S's breaches of the 703 Contract. Specifically, Dei testified that R & S had not paid Hardaway's March 31, 1995 and April 15, 1995 invoices, resulting in $644,542.46 in unpaid contract work. He also testified to the additional costs that Hardaway incurred for maintaining a field office at the South Fort Meade site beyond the period anticipated in the 703 Contract. Additionally, Dei explained that Hardaway incurred unanticipated overtime costs in attempting to make up time lost as a result of delays caused by R & S. Along with the unanticipated overtime costs, Dei testified that Hardaway was damaged from resulting overtime inefficiencies, standard industry figures representing the fact that workers performing overtime for extended periods of time become increasingly inefficient. In discussing these costs, Dei was careful to explain that he had deducted from his calculation of overtime and overtime-related damages those costs for which the parties had contracted, including 2,104 ironworker hours and 8,653 millwright hours. Dei also testified regarding the cost of the labor inefficiencies created by R & S's failure to deliver the steel on time and in the proper sequence, as well as R & S's failure to design the facility properly. Furthermore, Dei testified about the cost of the extra tools Hardaway had to buy as a result of R & S's delays and other breaches. Finally, Dei specifically denied that Hardaway had employed the total-cost method in arriving at the damages to which he testified.

The jury was entitled to believe this evidence. We find that accepting all of this testimony as true, the jury could have found, as it did, that Hardaway sufficiently proved the

non-speculative nature of its damages, Hardaway demonstrated that R & S's breaches proximately caused its damages, and Hardaway did not use the total-cost method in arriving at its statement of damages. Accordingly, we reject R & S's challenges to the damages award under the 703 Contract.

III.

We conclude that the magistrate judge acted within his discretion in applying the unilateral mistake doctrine to the facts involving the 712 Contract. Moreover, the magistrate judge did not commit reversible error in instructing the jury on the 712 Contract. Finally, the magistrate judge did not err in denying R & S's motion for remittitur. Accordingly, the judgment of the district court must be, and is, AFFIRMED.