[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13127

_____

D.C. Docket No. 0:15-cv-60474-JIC

GARY DEAR,

Plaintiff - Appellee,

versus

Q CLUB HOTEL, LLC,

Defendant - Appellant.

_____

No. 17-14285

_____

D.C. Docket No.  0:15-cv-60474-JIC

GARY DEAR,

Plaintiff - Appellant,

versus

Q CLUB HOTEL, LLC,

Defendant - Appellee.

———————————————

Appeals from the United States District Court
for the Southern District of Florida
———————————————

(August 9, 2019)

Before WILLIAM PRYOR, NEWSOM, and BRANCH, Circuit Judges.

NEWSOM, Circuit Judge:

This case concerns a contract dispute between Q Club—the entity that

operates the condominium-hotel at the Hilton Fort Lauderdale Beach Resort—and

a class of condo owners over the meaning of the "Declaration" that governs the

parties' relationship.  We're focused here on the Declaration's cost-sharing

arrangement for the maintenance of certain amenities that aren't tied to any

particular condo unit—expenses that the Declaration aptly calls "Shared Costs."

Litigation commenced soon after Q Club announced that it would change the

methodology that it uses to calculate these Shared Costs.  The new methodology, Q

Club explained, would apply not only on a going-forward basis but also

retroactively.  That meant, in effect, that the owners would be re-billed for

assessments that they had paid (or as Q Club sees it, underpaid) in years past.

The owners' complaint alleged that Q Club's new methodology breached the

Declaration as applied both retroactively and prospectively.  The district court

2

agreed with the first contention, but a jury disagreed with the second.  The parties now appeal the respective judgments against them.  The owners separately argue that the district court erred by denying their request for a new trial based on what they say constitutes newly discovered evidence that could have swayed the jury on the prospective-application question.  After careful review, we affirm across the board.

## I

### A

The Hilton Fort Lauderdale Beach Resort includes a number of "Commercial Units" and "Residential Units," as well as one "Hotel Unit."  The Residential Units aren't your typical condominiums; as the complaint explains, "no guest, including any Residential Unit owner, may occupy a Residential Unit for more than 120 days in any calendar year."  This restriction helps to "ensure the transient nature of the use of the Residential Units"; the owners serve dual roles as both "investor[s] and part-time resident[s] who [can] take advantage of the revenue-generating benefits of putting their unit into the hospitality inventory to be rented out as a luxurious hotel suite when not in use."

The "Declaration of Q Club Resort and Residences Condominium" outlines a cost-sharing arrangement for the maintenance of what it calls "Shared Components."  These Shared Components—which Q Club is responsible for

3

maintaining—include, among other things, "the main hotel lobby; the pools and pool deck; the fitness center . . . and all parking areas and/or parking garages located within the Condominium property." In short, they comprise many of what one might typically call the "common areas." The Declaration grants Residential and Commercial Unit Owners an easement to travel freely through and enjoy the Shared Components in exchange for periodic payments of "Shared Costs." Shared Costs are those "incurred by [Q Club] in (or reasonably allocated to) the repair, replacement, improvement, maintenance, management, operation, ad valorem tax obligations and insurance of the Shared Components." The Declaration requires Unit Owners to pay a portion of these Shared Costs. In particular, Unit Owners must—

> pay to [Q Club] annual charges for the operation and insurance of, and for payment of 40.4967% of the Shared Costs . . ., the establishment of reasonable reserves for the replacement of the Shared Components and the furnishings and finishings thereof, capital improvement charges, special charges and all other charges hereinafter referred to or lawfully imposed by [Q Club] in connection with the repair, replacement, improvement, maintenance, management, operation, and insurance of the Shared Components, all such charges to be fixed, established and collected from time to time as herein provided.

Shared Costs, the Declaration further explains, "shall be paid for in part through charges (either general or special) imposed against the Residential Units and the Commercial Units in accordance with the [Declaration's] terms."

4

This arrangement continued without incident from the Declaration's inception in 2007 until 2012, when Q Club determined that it had inadvertently omitted certain expenses that should have been included as Shared Costs.  As Q Club describes it, that meant that the Unit Owners hadn't been paying the required 40.4967% of the Shared Costs.  Accordingly, it notified the Unit Owners that it would begin to use a different methodology going forward and, further, that it intended to recoup the forgone charges over a 10-year period by applying the new methodology retroactively.

**B**

A class of Unit Owners—whom we'll call "Dear," after the lead plaintiff—filed this action in Florida state court, and Q Club successfully removed to federal court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1453.  Dear's complaint asserted (1) that the Declaration doesn't permit Q Club to "back charge" for costs incurred but not assessed and (2) that Q Club's new methodology for determining Shared Costs includes items that it shouldn't.  For simplicity's sake, we'll call the first issue the "back-charging" question and the second the "Shared Costs" question.

Because one of the appeals before us turns on whether the district court properly submitted a particular issue—namely, the Shared Costs question—to the

5

jury, a bit of procedural history is necessary. The parties initially agreed in their Joint Pretrial Stipulation that there were no "issues of law" for the district court to decide. On the back-charging question, Dear submitted as an "issue[] of fact which remain[ed] to be litigated at Trial" the question whether Q Club, "in violation of the Declaration," retroactively assessed Unit Owners for Shared Costs going back to 2007. Dear further included the Shared Costs question among the "issues of fact" for the jury's consideration—in particular, whether "Q Club breached the Declaration . . . by charging and collecting expenses . . . as Shared Costs . . . that are not authorized by the Declaration." For its part, Q Club didn't say anything about the back-charging issue, but it agreed with Dear that whether it had breached the Declaration "by charging for items that were not Shared Costs" was a question of fact for the jury.

The parties' unanimity on the division of labor between judge and jury was short-lived. When asked by the district court (in a discussion about the appropriateness of considering industry custom) whether "the declaration clearly define[s] what a shared component is," Dear answered "[a]bsolutely." In response, Q Club said that "if this definition is as clear as [Dear] says," then it was "baffled as to why this is a jury trial," and in light of Dear's statement Q Club pivoted to argue that the Shared Costs question was "a matter of law for [the court] to decide, not for the jury." Dear, though, stuck to his guns. When pressed by the district

6

court whether he agreed with Q Club that the Shared Costs issue was "for the Court [rather than] the jury," Dear responded that "it is for the jury." The district court acceded to Dear's view, stating that the determination whether a breach of contract had occurred was "a factual issue" "for the jury determine." It did so over Q Club's objections that it would be improper to "ask[] the jury to make a legal determination of what [the Declaration] says" and that the jury shouldn't "decide if something is a shared component or not."

Thereafter, Dear's insistence that the Shared Costs question should go to the jury seemed to soften, as evidenced by several instances in which he acknowledged that the issue—or at least portions of it—might be purely legal. For example, when Q Club moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law on both the back-charging issue and the Shared Costs issue, it argued that whether the Declaration authorized its changes was "a question of law"—there was, it said, "nothing for the jury to hear." Dear agreed—sort of. He responded that "[t]here's no doubt that [the] two issues in this case are issues of law" and, to that end, he said that he was "expecting and urging the Court to instruct the jury that there is no ambiguity [in the Declaration]." In the same vein, Dear acknowledged that "[w]hether something is a shared component is a matter this Court can determine as a matter of law," and he even indicated that he would be "asking the Court at the conclusion of the case to declare that anything that was

expended in the inside of these private property residential condominiums" was not "recoverable as shared costs."[1]  Conspicuously, though, Dear never filed his own Rule 50(a) motion on the Shared Costs issue.

Although the district court denied Q Club's Rule 50(a) motion as to both issues, it later determined that the back-charging issue (but not the Shared Costs issue) presented a legal question that it could and should decide for itself.  The court thereafter held that the Declaration "clear[ly] and unambiguous[ly]" forbids "retroactive charging for costs incurred in prior years."  Specifically, the court concluded that §§ 12.3 and 12.4, on which Q Club staked (and still stakes) its back-charging position—much more on that below—provided no authority for retroactive assessments.  Accordingly, the court entered judgment as a matter of law for Dear on the back-charging issue.

The case proceeded to trial on the Shared Costs issue.  Notably for present purposes, at the charge conference the parties tangled over several key jury instructions.  Two disputes are relevant here.  First, Dear wanted the district court to tell the jury that the court had decided the back-charging issue in his favor. After some back and forth—Q Club complained that Dear's proposed instruction

---

[1] Similarly, even after the district court denied Q Club's Rule 50(a) motion, Dear objected to the testimony of a Q Club expert on the ground that "[a]ny issues regarding the interpretation of the declaration are a matter of law" and that it was for the district court to decide "what those unambiguous terms mean."

would be prejudicial—the court settled on the instruction that the matter "ha[d] been adjudicated" and that the jury "should not consider this issue" in deciding the Shared Costs question.  Second, Dear asked the district court to instruct the jury that, "as a matter of law," the Declaration's definition of Shared Components controlled and that the jury was "required to use that definition."  (Notably, in so arguing, Dear admitted that he "should have probably argued this in the Rule 50.") The court declined to give Dear's proposed instruction; instead, it charged the jury that the parties "dispute[d] the meaning of certain terms," including "shared costs" and "shared components" and that in reaching its decision, it should "consider the plain and ordinary meaning of the language used in the contract" and "the circumstances surrounding the making of the contract."

Thereafter, the jury returned a unanimous verdict in Q Club's favor, finding that its new methodology for calculating Shared Costs didn't breach the Declaration.  Dear filed a post-judgment motion for a new trial.  (He didn't file a renewed motion for judgment as a matter of law under Rule 50(b) because he hadn't initially moved—as the Rule requires—for judgment as a matter of law under Rule 50(a).[2])  Dear contended (1) that the district court had erred by

---

[2] *See, e.g.*, 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2533 (3d ed. 2019) ("The requirement in Rule 50(a)(2) that grounds be stated on a motion for judgment as a matter of law before submission of the case to the jury is mandatory.  Its purpose is to apprise the trial court of the moving party's position to see if any defects can be corrected before the jury

allowing the jury to decide the Shared Costs issue, (2) that the court should have given his requested jury instructions, and (3) that he had new evidence that contradicted Q Club's position regarding Shared Costs and proved that Q Club had been "double-billing" for certain items.

On the first issue, the district court held that, even if it was an error to send the Shared Costs issue to the jury, it was an error that Dear had invited. The court emphasized that Dear had demanded a jury, hadn't moved for summary judgment, and had insisted at the pre-trial calendar call that the Shared Costs issue presented a factual question. The court further concluded that its jury instructions weren't misleading or erroneous and that, in any event, Dear couldn't show that the trial would have turned out any differently had his proposed charge been given. Finally, the court held that the new evidence that Dear had proffered didn't actually contradict Q Club's position on Shared Costs.

These appeals followed, with Q Club appealing the district court's adverse determination of the back-charging issue, and Dear appealing the jury's verdict on the Shared Costs issue and the court's denial of its new-trial motion.

## II

We'll start with Q Club's back-charging argument.

---

retires, and the failure of the motion to state the specific grounds relied on is in itself a sufficient basis for denial of the motion.").

10

First, a bit of black-letter background.  The interpretation of a contract is a question of law that we review *de novo*.  *S.-Owners Ins. Co. v. Easdon Rhodes & Assocs. LLC*, 872 F.3d 1161, 1163 (11th Cir. 2017).  In construing the Declaration here, we are *Erie*-bound to apply Florida contract-interpretation principles.  *See In re Chira*, 567 F.3d 1307, 1311 (11th Cir. 2009).  Accordingly, we will interpret the Declaration "in accordance with its plain meaning, and, unless an ambiguity exists, [will] not resort to outside evidence or the complex rules of construction to construe the contract."  *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996) (citations omitted).  In doing so, we must take care not to create confusion "by adding hidden meanings, terms, conditions, or unexpressed intentions."  *Id.* (citations omitted).  And we will construe the Declaration as a whole and will avoid treating terms "as redundant or mere surplusage" if "any meaning, reasonable and consistent with other parts, can be given to it."  *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1242 (11th Cir. 2009) (quoting *Roberts v. Sarros,* 920 So. 2d 193, 196 (Fla. 2nd Dist. Ct. App. 2006)).

Q Club's back-charging argument focuses on § 12 of the Declaration.  Q Club asserts that § 12 "authorizes [it] to revise charges for Shared Costs and levy those revised charges against Unit Owners" retroactively.  To assess Q Club's position, we'll need to unpack the relevant portions of the Declaration bit by bit.

11

As already explained, the Declaration states that Unit Owners are responsible for a portion of Shared Costs—meaning those costs "incurred by [Q Club] in (or reasonably allocated to) the repair, replacement, improvement, maintenance, management, operation, ad valorem tax obligations and insurance of the Shared Components." And again, these Shared Costs are payable through either "general" or "special" charges "imposed" against the Unit Owners.[3]

All here agree that we should limit our discussion to "general charges," as "special charges" are unit-specific penalties levied for "misuse" of the Hotel Unit. Within the "general charges" category, the Declaration speaks of the following: (1) "annual charges," also called—among other things—"regular charges" or "annual regular charges"; (2) "capital improvement charges"; (3) charges for "the establishment of reasonable reserves for the replacement of the Shared Components"; and (4) a catch-all for "all other charges hereinafter referred to or lawfully imposed" by Q Club "in connection with the repair, replacement, improvement, maintenance, management, operation, and insurance of the Shared Components."

_____

[3] The Declaration occasionally speaks of charges "imposed," and elsewhere, charges "levied." We'll treat these terms as synonyms, as the dictionaries do. *Compare, e.g.*, Oxford Dictionary of English 879 (3d ed. 2010) (defining "impose" as to "require (a duty, charge, or penalty) to be undertaken or paid"), *with*, *e.g.*, *id.* at 1016 (defining "levy" as to "impose (a tax, fee, or fine)"). *See also* Black's Law Dictionary 873 (10th ed. 2014) (defining "impose" as "levy or exact (a tax or duty)").

12

Q Club contends, in particular, that back-charging is authorized under either or both of the "annual charge[]" and "other charge[]" headings. We'll examine each candidate in turn.

## A

Q Club puts most of its eggs in the "annual charge[]" basket. It contends that retroactive assessments are permissible because the Declaration authorizes "revised charge[s]" that needn't necessarily be imposed or altered within a particular calendar year. For support, Q Club points to the following language in § 12.3(b): "The charge amount (and applicable installments) may be changed *at any time* by [Q Club] from that originally stipulated or from any other charge that is in the future adopted by [Q Club]." Clear as a bell, Q Club insists: the Declaration says that annual charges can be changed "at any time," without temporal restriction.

If we were to take the "at any time" language in isolation, Q Club's theory might work. But we can't, and so it doesn't. In contracts, as in statutes, "[t]he entirety of the document . . . provides the context for each of its parts." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (Thomson/West 2012). And § 12.3(b)'s context sinks Q Club's "at any time" position. To explain why, we'll need to show our work.

13

In relevant part—Warning: Dense contractual jargon ahead!—§ 12.3(b)
provides as follows:

> The annual regular charges provided for in this Section shall
> commence on the first day of the month next following the
> recordation of this Declaration and shall be applicable through
> December 31 of such year.  Each subsequent annual charge shall be
> imposed for the year beginning January 1 and ending December 31.
> The annual charges shall be payable in advance in monthly
> installments, or in annual, semi- or quarter-annual installments if so
> determined by [Q Club] (absent which determination they shall be
> payable monthly).  The charge amount (and applicable installments)
> may be changed at any time by [Q Club] from that originally
> stipulated or from any other charge that is in the future adopted by [Q
> Club].  The original charge for any year shall be levied for the
> calendar year (to be reconsidered and amended, if necessary, at any
> appropriate time during the year), but the amount of any revised
> charge to be levied during any period shorter than a full calendar year
> shall be in proportion to the number of months (or other appropriate
> installments) remaining in such calendar year.

Our breakdown of "annual charges" begins where § 12.3(b) does.  The
provision explains that the first set of "annual regular charges shall commence" on
the first day of the first month following the Declaration's recording—which
occurred in 2007—"and shall be applicable through December 31 of such year."
Thereafter, "[e]ach subsequent annual charge shall be imposed for the year
beginning January 1 and ending December 31," with the charges "payable in
advance" either annually, semi- or quarter-annually, or monthly.  The upshot, it

14

seems, is to ensure that Unit Owners have a sense of the "annual charge . . . imposed" come—at the latest—January 1 of a given year.[4]

Then comes the language that Q Club emphasizes. The Declaration provides that the initial "annual charge" (or as it's later called, the "original charge") isn't set in stone, but rather that "[t]he charge amount (and applicable installments) may be changed *at any time* by [Q Club] from that originally stipulated or from any other charge that is in the future adopted by [Q Club]." Q Club takes this to mean that it can alter the originally specified charge amounts for past years and that it can do so, quite literally, "at any time"—be it one year or, as in this case, even six years down the road.

Wait, though. In the very next sentence, the Declaration goes on to say that "[t]he original charge for any year shall be levied for the calendar year (to be reconsidered and amended, if necessary[)]"—and here's the key language—"at any appropriate time *during the year*[]." The addition of the words "during the year" to the phrase "at any appropriate time" narrows the window for an amendment of an "annual charge" that has already been "levied." In other words, the reach of the *general* statement that charges can be changed "at any time" is narrowed by the *specific* limitation that the "original charge" for a given year can be amended at

---

[4] The record supports this reading. For instance, in December 2012, Q Club provided Unit Owners with the "2013 Annual Charge Notice," which set the "projected 2013 annual charge amount" to be collected from all Unit Owners at just over $3.7 million.

15

any "appropriate time *during the year*." *Cf. RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384 (1992)) ("[I]t is a commonplace of statutory construction that the specific governs the general.").  Read in context, we think that § 12.3(b) is best understood to mean that a given year's "annual charge[]" can be "amended" only *within the year* that it is imposed.

Q Club complains that our reading neuters the effect of the "at any time" language, such that the sentence "could be removed from the text entirely without changing the meaning of the provision."  We don't think so.  Yes, the Declaration gives Q Club license to "revise[]" charges "at any time"—including for periods beyond the year in which the revision is instituted.  But § 12.3(b) contemplates that such revisions will typically occur from one year to the next.  Were that not the case, it would make little sense for the Declaration to include the proration qualifier about "any revised charge to be levied during any period shorter than a full calendar year."  That is, *all* intra-year revisions would "be levied during a[] period shorter than a full calendar year."  The qualifier's inclusion, therefore, suggests that "revised charge[s]" can (and often will) include changes that apply from one year to the next.

Q Club further asserts that its reading of § 12.3(b) is bolstered by "non-waiver principles expressed in section 12.4."  Section 12.4 provides, as relevant

16

here, that Q Club's failure "to send or deliver bills or notices of charges shall not relieve [Unit] Owners from their obligations hereunder."  Q Club infers a greater-includes-the-lesser sort of principle from this language; it says that "[i]f a failure by Q Club to send *any* notice" works no waiver, then surely sending a bill for the wrong amount similarly doesn't "relieve the Unit Owners' obligation to pay the appropriate percentage of Shared Costs" either.  Clever, but not right.  Section 12.4 means just what it says: it addresses only those instances in which Q Club fails to deliver a bill at all, not those in which Q Club sends a bill for what it later claims was the wrong amount.  Section 12.4 does interact with § 12.3(b), as Q Club says, but only to set a default charge in the absence of a bill.  Whereas § 12.4 means that Unit Owners are still on the hook for some portion of Shared Costs, § 12.3(b) explains what that portion is: the same "amount payable for the previous period," until changed.  It's a different question altogether—one that § 12.3(b) doesn't address—whether Q Club can revise annual charges outside the year that they are originally "levied."

From how they are initially "imposed" to the way they can be "revised," it's clear to us that a given year's "annual charges" may not be retroactively changed in future years.  Rather, when the Declaration speaks of "revised" annual charges, it contemplates that the revisions will occur within the year that the costs are

17

incurred.  This reading, we think, is faithful not only to isolated snippets of the Declaration's text, but also to § 12 when considered as a whole.

**B**

Unable to fit retroactive assessments into the "annual charge[]" bucket, Q Club next contends that back-charging is permissible under § 12's catchall for "all other charges hereinafter referred to or lawfully imposed . . . in connection with the repair, replacement, improvement, maintenance, management, operation, and insurance of the Shared Components."  This make sense, Q Club argues, not only because these "other costs" aren't subject to any clear temporal limitation, but also in light of the usual rule that provisions in a contract should be construed to avoid surplusage.  *See Equity Lifestyle Props.*, 556 F.3d at 1242.

Though Q Club makes some fair points, this argument too falls short.  The problem is that the Declaration doesn't speak of "other charges" in the abstract; rather, permissible "other charges" must be either "hereinafter referred to" or "lawfully imposed."  As Q Club all but conceded at oral argument, the Declaration doesn't "refer[] to" any "other charges" except annual charges, reasonable-reserve charges, capital improvement-charges, and special charges—*i.e.*, the enumerated categories that precede the "other charges" language and that we've dealt with already.  We conclude, therefore, that "other charges hereinafter referred to" is—unfortunately—surplusage.  It happens.  *See* Scalia & Garner, *supra*, at 210

18

(explaining in the hypothetical example of "federal Senators, federal Representatives, and other members of Congress," that the "concluding phrase simply cannot bear any other meaning than the one exhausted by the preceding specifics" and "must be treated as surplusage").

That leaves us with "[o]ther charges . . . lawfully imposed." Q Club assures us that it "has located nothing in Florida law that is hostile to" back-charging and adds that other states—namely, Illinois, Maine, New Jersey, and Pennsylvania— "also lack hostility" to such charges. We are unmoved. The fact—if it's indeed a fact—that retroactive assessments may not be forbidden by the general laws of some states doesn't mean that they are authorized by the governing Declaration here. We can assume that the phrase "[o]ther charges . . . lawfully imposed" means *something*, but we think that Q Club makes way too much of way too little. To say—despite all of the contrary textual indications—that this vague catchall provision allows Q Club to bill for one amount only to revise the charge years later would be akin, as has been said in other contexts, to finding an elephant in a mousehole. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Without a stronger signal from Florida's courts, it's not our place to read in this kind of "hidden term" into the Declaration. *See Key*, 90 F.3d at 1549.

* * *

19

Because neither the "annual charge[]" nor "other charge" heading fits the bill, we conclude that the district court correctly held that the Declaration doesn't permit the sort of back-charging that Q Club advocates.   Q Club complains that our reading renders the agreement, "illogical, unjust, and unfair."  But it's "not the function of the courts to 'rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain.'" *Marriott Corp. v. Dasta Const*. Co., 26 F.3d 1057, 1068 (11th Cir. 1994) (quoting *Steiner v. Physicians Protective Tr. Fund,* 388 So.2d 1064, 1066 (Fla. 3d Dist. Ct. App. 1980)).  We decline to stretch the Declaration's language in an effort to relieve Q Club of the "hardship" that stems from what appears to have been its own miscalculation.

## III

We turn, then, to Dear's cross-appeal.  Dear contends that the district court erred by submitting the Shared Costs issue to the jury.  Alternatively, he says that even if it was proper to leave some interpretive matters to the jury, the court should have better guided the jury's decision-making process by giving a few additional jury instructions.  And finally, Dear asserts that he discovered new evidence after the trial that entitles him to a new trial.  We find no reversible error.

20

## A

Dear first and primarily faults the district court for submitting the Shared Costs issue to the jury at all. He contends that the court should have resolved the Shared Costs issue in his favor and then instructed the jury that Q Club had been charging for Shared Costs in a manner that violated the Declaration. In other words, Dear insists that the only proper question for the jury was the amount of damages flowing from Q Club's as-a-matter-of-law breach.

The question, therefore, is who should have decided the Shared Costs issue—the judge (as Dear now says) or the jury (as happened)? "Under Florida law, as generally, where the language of an agreement is unambiguous, the legal effect of that language is a question of law and, as such, may be declared by the court." *Maccaferri Gabions, Inc. v. Dynateria Inc.*, 91 F.3d 1431, 1439 (11th Cir. 1996). If, however, the contract is "reasonably susceptible to more than one interpretation, it is ambiguous and its meaning is a question for the jury." *Id.* This standard is easier stated than applied, as it can be difficult to determine whether a contract is truly ambiguous. *See Gas Kwick, Inc. v. United Pac. Ins. Co.*, 58 F.3d 1536, 1539 (11th Cir. 1995) (citations omitted) (noting that "ambiguity is not invariably present when a contract requires interpretation"); *Meyers v. Selznick Co.*, 373 F.2d 218, 221 (2d Cir. 1966) (Friendly, J.) (explaining that the general principle that "[t]he construction of all written instruments belongs to the court" is

21

not an "unvarying rule" and noting the associated difficulties with deciding whether to send interpretive questions to a jury) (quotations omitted).  Notably, though, Q Club doesn't seem to defend the district court's decision to send the issue to the jury by, say, highlighting any apparent ambiguities in the Declaration.  And that's perhaps not surprising given Q Club's pre-trial (and mid-trial) position that the Shared Costs issue presented a question of law for the court and that it was "baffled as to why this [was] a jury trial."

All of this is to say that Dear may be right that the Shared Costs issue is a pure question of law and that the district court mistakenly sent it to the jury.  The problem for Dear is that he never asked the court to take the issue away from the jury in a Rule 50(a) motion for judgment as a matter of law.  Presumably in an effort to salvage his position from waiver, on appeal Dear claims—confusingly to us—that he "joined in Q Club's JMOL."  But it's unclear how such a "join[der]" would work.  Rule 50(a) requires that the movant "specify the judgment sought and the law and facts that entitle the movant to the judgment."  In filing its motion, Q Club clearly complied, contending not only that "whether [its] actions [were] allowed under the contract" was "a question of law for the judge to decide" but also that it—Q Club—was entitled to a judgment as a matter of law because "there was no breach of the contract."  Dear never filed a similar motion.  And it makes no sense for Dear to say that he could piggyback on Q Club's motion because, of

course, Dear didn't agree with "the judgment sought" there—namely, a judgment *in favor of his adversary*.

Dear attempted to shore up his position at oral argument by asserting that Rule 50(a) motions can be made "at any time and in any form." And in fairness, we've taken a broad view of what constitutes a "motion" for judgment as a matter of law. In *Etienne v. Inter-County Sec. Corp.*, we construed a plaintiff's response to a defendant's Rule 50 motion as the plaintiff's own motion in light of our "liberal view of what constitutes a motion for judgment as a matter of law"—but only because the plaintiff there "requested that the court enter judgment for him" and because "the opposing party and the trial judge were informed of the [plaintiff's] argument." 173 F.3d 1372, 1374 (11th Cir. 1999). Even measured by that permissive standard, Dear's approach doesn't cut it. Missing from the record is *any* statement in response to Q Club's motion in which Dear contended that, as a matter of law, he was entitled to win then and there.[5]

The closest Dear came was saying that "[w]hether something is a shared component is a matter this Court can determine as a matter of law" and previewing that he planned to "ask[] the Court at the conclusion of the case to declare that

---

[5] Not for nothing, but at the conclusion of Q Club's oral Rule 50(a) motion, the district court noted that it was "required to view the evidence in a light most favorable to the *nonmoving* party, the Plaintiff [Dear]," and that "the *Defendant*'s [Q Club] Rule 50 motion will be respectfully denied." At no point during this colloquy did Dear follow up with a request that the court rule on any supposed Rule 50 motion of his own.

anything that was expended in the inside of these private property residential condominiums" wasn't "recoverable as shared cost for shared components." Critically, though, he never followed through on that pledge by filing a Rule 50(a) motion. And indeed, even during what he now describes as his act of "join[ing]" Q Club's motion for judgment as a matter of law, Dear framed his arguments exclusively in terms of how the court should eventually *instruct the jury*. He explained that "we're expecting and urging the Court to instruct the jury that there is no ambiguity [in the contract]" and, further, that "[t]he term shared component is listed under definitions and fully and completely defined, and so we're going to ask the Court at the conclusion of the case to instruct the jury on that." These statements demonstrate that, far from seeking to take the Shared Costs issue away from the jury, Dear envisioned that the jury would play a meaningful role in interpreting the Declaration.

Although Dear occasionally (if inconsistently) tried to suggest that contract-interpretation questions are "matter[s] of law" for the court, he never quite took the plunge: Despite hinting that he would, he never made a Rule 50(a) motion—or any other motion—asking "the Court . . . to declare" anything. In light of Dear's initial insistence that the Shared Costs issue should go to the jury and his failure to

24

file his own Rule 50(a) motion, his claim of error is forfeited at best.[6] *See Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004) (holding that "a party cannot assert grounds in the renewed motion that it did not raise in the earlier motion" to prevent the "sandbag[ging]" of opposing counsel) (quotations omitted).

We note in closing that even if Dear had preserved this issue, he hasn't established—or even really tried to establish—why the jury's verdict was wrong. Dear says repeatedly in his brief that the jury's verdict was "incorrect as a matter of law" and that Q Club's new methodology is "contrived." But he never explains *why* the jury's verdict was "incorrect as a matter of law" or *why* Q Club's methodology is "contrived." "[S]imply stating that an issue exists, without further argument or discussion," isn't enough. *Singh v. U.S. Atty. Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009). Because Dear hasn't established that he was entitled to judgment as a matter of law, he can't show that he was prejudiced by the district court's decision to send the Shared Costs issue to the jury.

---

[6] At worst, this was an error that (as the district court concluded) Dear invited. "Where invited error exists"—meaning that a party has "induced" the court into error by his own conduct—"it precludes a court from invoking the plain error rule and reversing." *United States v. Love*, 449 F.3d 1154, 1157 (11th Cir. 2006) (quotations omitted). Dear's mid-trial efforts to correct his pre-trial call to send the issue to the jury—even though ultimately incomplete—may have prevented invited error here, but they don't save him from forfeiture. We note, however, that Dear's position on appeal would essentially allow him to get two bites at the apple by allowing him to hedge against an unfavorable jury verdict, a result that the invited-error doctrine is designed to prevent.

**B**

Dear separately argues that the district court erred in failing to give his requested jury instructions.  He argues here that the court's failure to do so misled the jury, which, as a result, "returned a verdict that was incorrect as a matter of law."

District courts have "broad discretion in formulating jury instructions," and we assess the entirety of the instructions "to determine whether they fairly and adequately addressed the issue and correctly stated the law."  *Christopher v. Cutter Labs.*, 53 F.3d 1184, 1190 (11th Cir. 1995) (citations omitted).  When faced with an argument that a court abused its discretion in refusing to give a requested instruction, we will find reversible error only "if (1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party."  *Roberts & Schaefer Co. v. Hardaway Co.*, 152 F.3d 1283, 1295 (11th Cir. 1998) (citation omitted).

With this background in mind, we will assess each of Dear's requested instructions separately.

**1**

Dear first argues that, at the very least, the district court should have instructed the jury to apply the term "Shared Components" as it is defined in the

26

Declaration itself.  This instruction, Dear says, would have better "advise[d] the jury about the parameters of its decision."

Even if we were to grant that it might have been prudent for the district court to give Dear's instruction, we can't conclude that the court abused its discretion by not doing so.  After examining the jury instructions in their entirety, we're convinced that they "fairly and adequately addressed the issue[s]" at hand. *Christopher*, 53 F.3d at 1190.  The district court instructed the jury that the parties disputed the "meaning of certain items including . . . Shared costs [and] Shared components."  And critically, the court continued that "[i]n deciding what the terms of [the] contract mean," the jury should "consider the plain and ordinary meaning of the language used in the contract as well as the circumstances surrounding the making of the contract."  Finally, the court told the jury to "assume that the parties intended the disputed terms in their contract to have their plain and ordinary meaning, unless [it] decide[d] that the parties intended the disputed terms to have another meaning."  These statements, collectively, charged the jury to use the plain meaning of the term "Shared Components," which naturally would have pointed the jury in the direction of how that term is explained in the Declaration's definitions section.

Moreover, and in any event, Dear hasn't established that the district court's failure to give this instruction "resulted in prejudicial harm."  *Roberts & Schaefer*,

27

152 F.3d at 1295. He hasn't, that is, explained why, but for this failure, the jury could have come out the other way—let alone why he is entitled to judgment as a matter of law. We find no reversible error on this point.

**2**

Dear next challenges the district court's instruction regarding its earlier ruling that the Declaration forbids back-charging. As already explained, the district court charged the jury "not [to] consider" the back-charging issue in reaching its decision on Shared Costs because it "ha[d] been adjudicated." Dear contends that the court's instruction prejudiced him because the jury might have concluded that he had lost. In his mind, the court should have told the jury that he'd won.

We find no abuse of discretion in the district court's choice here either. Indeed, we think that the district court was on firm footing framing the instruction the way it did. The question whether Q Club breached the Declaration by applying the new methodology retroactively has two subparts: first, whether the Declaration allows back-charging at all, and second—even if it does—whether Q Club nonetheless breached by including charges that were not in fact Shared Costs.[7]

---

[7] Dear even acknowledged this in his response to Q Club's Rule 50(a) motion, explaining that "[e]ven if the Court determines that somehow [Q Club] can go back six years and charge for items that were never charged, then you have to determine what of those charges were actually allocated reasonably," including the question of what "consisted of . . . shared components" and "shared cost for shared components."

The district court's "Order Re: Back-Charging" touches on the first question but doesn't say a lick about the second; it explains that "the Declaration does not permit retroactive charging for costs incurred in prior years" but is mum on whether, independently, the charges violated the Declaration.  The question whether the Declaration permits Q Club to apply its methodology retroactively simply has no bearing on whether the methodology is legitimate in the first place.

Similarly, it's difficult to see how Dear could have been prejudiced by the district court's instruction.  To say that the matter "ha[d] been adjudicated" is perhaps the most neutral way to ensure that the jury was not swayed—either way—by a judgment on an issue that was ultimately irrelevant to the one before it.  Indeed, Dear's preferred instruction—that the back-charging issue had been resolved in his favor—could have unduly prejudiced Q Club because, as it explained during the charge conference, the jury might have assumed that "if [Q Club] breached [on the back-charging issue], that automatically entitles [Dear] to damages under the shared cost issue."  For these reasons, the district court didn't abuse its discretion in giving such an even-handed, plain-vanilla instruction.

## C

Finally, Dear argues that the district court erred in denying his motion for a new trial under Federal Rule of Civil Procedure 59, which was grounded on his assertion that he had unearthed evidence that contradicted Q Club's trial position

29

on the Shared Costs issue.  Specifically, Dear claimed to have found deposition

testimony from an unrelated 2010 case in which Andy Williams, Q Club's then-

corporate representative, testified, in effect, that the Unit Management Agreement

fees cover in-unit housekeeping costs.  At the trial in this case, Sergio Pagliery, Q

Club's current rep, stated that housekeeping costs are actually part of Shared Costs.

Williams's testimony, Dear says, "directly contradicts" Pagliery's, thus warranting

a new trial.  We disagree.

We review a district court's treatment of a motion for a new trial for an

abuse of discretion.  *See McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d

1241, 1255 (11th Cir. 2016) (citation omitted).  "Deference to the district court is

particularly appropriate where a new trial is denied and the jury's verdict is left

undisturbed." *Id.* (quotations omitted).  We have made clear that "[m]otions for a

new trial based on newly discovered evidence are highly disfavored" and "should

be granted only with great caution." *United States v. Campa*, 459 F.3d 1121, 1151

(11th Cir. 2006) (en banc) (quotation omitted).  To warrant a new trial, Dear bears

the heavy burden of showing

> that (1) the evidence was discovered after trial, (2) the failure of the
> defendant to discover the evidence was not due to a lack of due
> diligence, (3) the evidence is not merely cumulative or impeaching,
> (4) the evidence is material to issues before the court, and (5) the
> evidence is such that a new trial would probably produce a different
> result.

30

*United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003) (quoting *United States v. Ramos*, 179 F.3d 1333, 1336 n.1 (11th Cir. 1999)).

Dear hasn't met his burden here. Even if Dear's failure to find this evidence previously wasn't for want of diligence, the new evidence wouldn't "probably produce a different result" at a new trial. *Id.* As the district court recognized, this "new" evidence "does not actually contradict the trial evidence on housekeeping costs" at all. Among other problems, Williams's testimony concerned Shared Costs as they were calculated using the old methodology. Accordingly, what Williams said in 2010 has no bearing on—and certainly doesn't contradict— Pagliery's testimony, which described Q Club's practice after it changed its methodology in 2013. The district court was well within its discretion to deny Dear's motion for a new trial on this ground.

## IV

To recap, we hold (1) that the district court properly concluded that the Declaration doesn't permit back-charging, (2) that the district court didn't reversibly err in submitting the Shared Costs issue to the jury or in the way that it instructed the jury, and (3) that Dear hasn't met his burden for requesting a new trial because the "new" evidence wouldn't likely produce a different result.

**AFFIRMED.**

31